# MARYLAND CASUALTY CO. v. CROSBY.

## No. 3301.

Court of Civil Appeals of Texas. Beaumont.
May 25, 1938.

Rehearing Denied June 1, 1938.

Victor Ippolito and Smith, Smith & Boyd, all of Beaumont, for appellant.

Mike Daughtry and Howth, Adams & Hart, all of Beaumont, for appellee.

WALKER, Chief Justice.

This suit, a compensation case, was filed by appellee, B. F. Crosby, the employee, against appellant, Maryland Casualty Company, the compensation carrier, in the district court of Jefferson County as an appeal from an adverse award of the Industrial Accident Board, made on the 9th day of February, 1937. Appellee alleged that, on or about the 10th day of April, 1931, while in the course of his employment with the Texas Company and while using an electric blowtorch, his eyes were burned severely by the torch, and as a proximate result "the vision of his right eye will eventually be totally lost and that of his left eye will steadily diminish to a point of no practical value," and that his "injury was the producing cause and naturally resulted in the permanent loss of ninety-six (96%) per cent of the normal vision of his right eye, and the permanent loss of thirty (30%) per cent of the normal vision of his left eye, continuous headaches of a severe character, extreme nervousness and sleeplessness, dizzy spells and continuous pain in the structure of his eyes; ordinary sunlight causes him to suffer severe headaches and any extended work causes him to suffer dizzy spells or vertigo, and during such attacks he is compelled to sit down or recline to prevent falling." Appellee further alleged that his injuries were permanent in nature and that they had prevented him in the past, and would prevent him in the future, from procuring and retaining employment, "thus rendering him totally and permanently disabled to work and earn money." The prayer was for judgment for "total and permanent disability" under our Workmen's Compensation Act, Vernon's Ann. Civ.St. art. 8306 et seq., for 401 weeks to be paid in a lump sum. Appellant answered by demurrers, general denial, and certain special pleas, but all defenses briefed before us were available to appellant under its general denial. On the verdict of the jury answering special issues, judgment was entered in favor of appellee against appellant for the sum of $6,682.88 to be paid in a lump sum. From the judgment appellant has duly prosecuted its appeal to this court.

On the weight and sufficiency of the evidence appellant makes the following contentions: (a) The evidence failed to raise the issue of "permanent total disability" and the verdict of the jury finding "permanent total disability" was against the "overwhelming weight and preponderance of the evidence"; (b) under the "uncontradicted evidence" appellee's loss of vision was due to "a refractive error of

a congenital nature" and was not caused by "an accidental nature"; (c) all the other physical and nervous disorders pleaded by appellee and supported by his evidence proximately resulted from the "refractive error"; (d) if the evidence raised the issue of a "disability," such disability was "not permanent in its nature"; (e) there was no evidence raising the issue that appellee was suffering from "extreme nervousness and sleeplessness"; (f) there was no evidence tending to show that appellee was suffering from any "partial loss of the vision of his left eye"; (g) under the evidence appellee's disability "was limited and confined to not more than his right eye, not affecting his body generally." These contentions are briefed by appellant under propositions 5, 6, 7, 8, 9, 11, 15, 16, and 17. The controlling evidence on these issues was as follows:

Dr. W. F. Taliaferro testified:

"He (Crosby) told me about being exposed to this electric arc and falling from behind his shield and being exposed to the rays from this electric arc or electric welder.

"Q. The history he gave you of being burned in the eyes with that electric—from the history that he gave you—would it be expected that he would suffer from pain with that, Doctor? A. They are extremely painful; all those flashes, electric or acetylene welders either.

"Q. Doctor, what probable effect would heat or light have on his eyes? A. Well, an eye that has been flashed a lot of times, or had an unusually heavy flash like this, would naturally be sensitive to heat and light from that time on.

"Q. The condition that you found there from your examination, Doctor, would you tell the gentlemen of the jury that that would probably be permanent? A. I would think so; if it has lasted for a year, and the type of flash that he had; these electric welders, the flash is much stronger than acetylene welders; the precautions are stricter with electric arc welders than they are with acetylene welders.

"Q. Doctor, assuming that this happened to him on April 10, 1936, it would be over a year when you made your two examinations, wouldn't it? A. Yes, sir.

"Q. And I do understand that since it has been over a year that that would add to your opinion about the permanency of it? A. It seems from his condition now that it

is a permanent condition as a result of that flash.

"Q. Assuming that he was injured in this way on April 10th of 1936, and since it has been something over a year now since that happened, and from your examination generally, tell the gentlemen of the jury about the possibility of a complete loss of vision in the course of time. A. Well, it is impossible to say just what chance there is, or how probable or improbable. It can happen. It may happen, and may not. If the trend of this trouble is downward, if he seems to be growing worse, the chances are that undoubtedly his eyes will be still worse. If the tendency seems to be towards improvement, naturally you expect the eyes to be on the mend, and probably improved. You can't say; nobody can tell about things like that. We don't know. * * *

"Q. Taking these facts into consideration, would you say that the condition you found this man, from the examination of this man's eyes, could have been caused by that flash, just that one flash? A. Yes, sir. You mean this sensitiveness and pain in the eyes. * * *

"Q. Doctor, the testimony shows that only recently he made an effort to go over and do some work in the Pennsylvania Shipyards; for some little bit, he hasn't been working any where, but he did make an effort to go over there; and his wife testified that she had to get a container of ice water and put applications of iced cloths on his eyes and had to do that virtually every night. Would that be a situation that you would more or less expect from the condition he is in? A. Yes; that's the natural thing to happen to cases of that kind. There are a lot of men that have to give up welding, have to leave off welding, men that have been exposed too much or flashed too often; their eyes get sensitive to light and they can't stand light like they could before; men who have been in the far north and had snow blindness, that is practically the same condition; they get so their eyes are so sensitive, they can't stand glare on snow or white sands or things of that kind, on account of the damage that has been done to the optic nerve through the previous exposure; and a man that has been flashed too many times by any of these welders, acetylene or electric, or had too heavy a flash, naturally his eyes are sensitive from that time on to too much light; he can't stand it like he could before; like a man who has had a heat stroke; if a man once

has a heat stroke he can't stand heat like he could before.

"Q. Would heat have a bad effect on him, too, Doctor? A. Naturally that would affect him, too.

"Q. Now, Doctor, assuming that a man while welding slipped and his torch, the flames from his torch, strike the side of a pot, and it is an instant flash, and that is what happens—now, just a flash; would you say that that could cause the condition that you found in this man from your examination? A. Yes, I will say it could, from an electric arc."

Dr. C. W. Fullbright testified:

"I examined B. F. Crosby after April 10, 1936. I examined him April 13th. I examined his eye. As to the condition I found wrong with his eye. Well, Mr. Crosby came in saying that on the 10th of· April while he was welding this dope bucket that he received a flash. That was on the 10th and I saw him on the· 13th, and. at that time he said he received the flash in his right eye. He first complained of his right eye; then on the 17th he came to my office with his left eye stuck up. Conjunctivities in his left eye. So then I treated him for both eyes, until 5/8/1936."

Dr. Edward W. Griffey testified:

"Q. My question is, how far is one of these workmen when he gets one of these typical flashes you are talking about from the flame he is working with? A. Generally a few feet.

"Q. How far do you mean by a few feet? A. Maybe three, maybe six, maybe ten.

"Q. Could a flash touch the eye as far as ten feet away from one of those things? A. Yes.

"Q. Further than that? A. Oh, yes.

"Q. How far? A. You may have a prolonged exposure as far as sixty feet; if it is a prolonged exposure it can do damage to that point; it can produce all these symptoms that we have been trying to tell about."

Appellee testified (Questions and Answers reduced to narrative):

"I had been working as a welder and boilermaker helper for The Texas Company for seven years prior to April 10, 1936, when I burned my eyes while doing electric welding. I returned to work on May 18, 1936, and worked ,until August 14th. They wouldn't let me do welding work after I went back the last time, as I couldn't see how to work, could hardly see how to do anything. I did a little burning with an acetylene torch and a little caulking out in the tank field, that is, I tried to, but couldn't see what I was doing. I couldn't do the work because the sun was too hot, I never wore glasses before April 10, 1936, never had occasion to, never had any pain in my eyes before that date, never had any headaches before that date. I have had lots of trouble trying to work since April 10, 1936; since that time my head continually hurts, sometimes it hurts worse than it does other times, sometimes the pain is sharp, sometimes dull; then' again it hurts so badly I ain't got a bit of sense hardly. When I am ·out in the light it hurts a whole lot and after I come in in the afternoon it hurts pretty badly at nights especially. I can't go in the·sun without having a shield over my glasses, and with a shield over my glasses my head still hurts right across here (indicating). Since April 10, 1936, if I get hot I get dizzy, I can't stand to get hot, it doesn't make any difference what I am doing, if I get hot I have to give it up right then. Before I burned my eyes I had not been suffering from headaches at any time in my life, up until then heat had no effect on me.

"I tried to work at the Pennsylvania Shipyards from February 10, 1937, to May 27th; when I first went there I had a job using an acetylene torch, but had to give it up on account of my eyes; my work was attempting to burn lines made with a big wide mark, but I had to quit because it hurt my eyes and I got so I couldn't see the lines. I then tried caulking in a barge for about a week, but couldn't do the work because it was too hot down in those tanks. When I get hot I have those dizzy spells, I fell there a couple of times. I sat on the bottom of the tank until I could get cool, I toughed it out that way for about a week; the heat of doing the work caused the trouble; I couldn't stand it at all; it was too hot. All this time I suffered with my head. I was then put to chipping knots, but I quit that because it got so hot I couldn't stay there on account of my head. When I would chip · those knots I would get hot, I would sit down a little while and cool off and then go back and chip some more; I got to where I couldn't stand it at all out there in the hot sun."

"My vision is much less than before my injury; I can't see near as well as I did; they are worse than they were; they are weaker now than before Christmas; since Christmas last year they have grown worse; my head hurts all the time, night and day."

"'My vision is worse now than it was prior to my injury. I don't see any wise like I did. It is worse than it was last Christmas (Christmas subsequent to his injury); my headaches are not any better; I can't tell that it gets any better at all; it just all the time hurts me all the time, continuously night and day. I worked because my family needed something to eat and I had to get something some way or the other."

Robert Hamm testified that he worked with appellee at the Pennsylvania Shipyards after his injury, worked with him for about five days on a scaffold 14 or 15 feet high; most every day appellee complained about his eyes; one day "I was standing beside him and saw him start rocking back and forth, and so I took him by the arm and held him, and he climbed down and laid down on the boards at the bottom of the tank about twenty minutes until he could cool off." This happened twice; "Crosby didn't call out to me, I just observed that he was rocking and I voluntarily caught him. Mr. Crosby's head caused him to sway, that was what he complained of."

Garland Austin testified that he worked with appellee at Pennsylvania Shipyards; that appellee "complained" with his head hurting him a lot and lots of places; appellee worked outside the tank; he couldn't stand the heat, "so he claimed"; one day appellee fell inside the tank, "I didn't see him fall, but I went down in the tank about the time he did fall." "One day I saw him leaning against the bars and he asked me to stop a leak for him and said he was dizzy and could not see. On more than one occasion I did his work."

Appellee's wife testified:

"Before April 10th last year I never had occasion to do anything for my husband's headaches. He had never worn glasses before April of last year. When my husband came home from work on April 10, 1936, his eyes were burned; they were red, and he was suffering terribly with them."

"While my husband was working for the Texas Company, after his injury, I often had to use ice cloths on his right eye, and I put argyrol in them very often, and, those ice packs. I do that every time he has those nervous headaches. He has them very often. In dressing his eyes at night I put ice packs, eye cloths, on them off and on. I take a pan of ice water and then put the cloths on and off until he gets relief; I have done it for a half a night at a time.'"

Had the jury accepted as true appellant's evidence, it would have found in its favor on all points urged under these propositions. But, as said by Judge Sharp in Stevens v. Karr, 119 Tex. 479, 33 S.W.2d 725, "The rule is well settled that it is error to instruct a verdict when the evidence raises any material issue." The evidence showed that, subsequent to his injury, appellant had done some work, but this fact was merely evidentiary, and did not defeat his claim for permanent, total disability; Aetna Life Insurance Co. v. Bulgier, Tex. Civ.App., 19 S.W.2d 821; Davis v. Texas Employers' Ins. Ass'n, Tex.Com.App., 29 S. W.2d 987, 988. In determining the issue of permanent, total disability, the jury had the right to believe and accept as true the facts testified to by appellee and his wife, Texas Employers' Ins. Ass'n v. Scott, Tex. Civ.App., 46 S.W.2d 348; together with every legal inference that could be legally drawn therefrom, Maryland Casualty Co. v. Wilson, Tex.Civ.App., 108 S.W.2d 260. When measured by these general propositions, the evidence quoted above satisfactorily supports the issues attacked by appellant's propositions. Thus, before his injury appellee was a healthy workman, able to perform the duties of his employment with ease and without the physical and nervous disorders, described by his testimony; since his injury, because of pain in his eyes, dizziness, headaches, etc., he is not able to work, nor to hold a job. Before his injury, his eyes did not hurt him, he did not have headaches, etc; but since his injury he suffers all the physical and nervous disorders complained of in his petition. The condition of his eyes has constantly grown worse since his injury; on the issue of the present and future condition of his eyes, Dr. Taliaferro testified: "It seems from his condition now that it is a permanent condition as a result of that flash." Appellee's "condition now," under his testimony and that of his wife, was a "total disability."

We give the fourth issue submitted to the jury: "From the preponderance of the evidence, do you find that the personal injury, if any, suffered by B. F. Crosby on or about April 10, 1936, caused a partial loss of the vision of plaintiff's right eye and left eye, continuous headaches of a severe character, extreme nervousness, sleeplessness, dizzy spells and continuous pain in the structure of plaintiff's eyes?" By propositions 2, 3, 4, and 26, appellant asserts that this issue was "multifarious," "duplicitous," and "inquires" of

more than one "issue," (a) "partial loss of vision," and (b) "matters in the field of a general injury," and was "on the weight of the evidence." These propositions are overruled. All the physical and nervous disorders submitted by this question were plead by appellee as the producing cause of his permanent, total disability; and were supported by the testimony. He had the right to an affirmative submission of the very issue made by his pleadings and evidence. Had appellee plead that each of these physical and nervous disorders was a producing cause of his disability, then the question would have been multifarious; but that was not his pleading. The following authorities support our construction of question No. 4: Security Union Ins. Co. v. Guthrie, Tex. Civ.App., 41 S.W.2d 315, 317, writ dismissed; Lumbermen's Reciprocal Association v. Pollard, Tex.Com.App., 10 S.W.2d 982; Texas Employers Ins. Association v. Hamor, Tex.Civ.App., 97 S.W.2d 1041, 1044.

The error, if any, in the submission of question No. 4 was harmless, and the jury's answer thereto did not control the judgment in appellee's favor. The jury found that appellee's "disability or incapacity" was not "limited to his eyes alone"; and that the personal injuries, alleged by him as the cause of his permanent, total disability, resulted in "total incapacity to work and earn money," and that "such total incapacity," was "permanent." These questions found in appellee's favor the issue of "permanent, total disability."

The statement we have made above answers appellant's propositions that issue No. 3 submitted to the jury was without support in the pleadings: "From the preponderance of the evidence, do you find that the personal injury, if any, sustained by B. F. Crosby on or about April 10, 1936, was caused by the arc or flame of an electric welding torch?"

The court refused appellant's request to submit the following issue: "Do you find from the preponderance of the evidence that plaintiff's incapacity, if any, was caused solely by causes other than a flash from an electric welder's torch, on or about April 10, 1936?" Appellant introduced evidence raising the issue, and no other issue, that appellee's disability was caused solely by "a refractive error of a congenital nature." Appellant's requested issue should have been restricted by its terms to the evidence introduced. Armour & Co. v. Tomlin, Tex.Civ.App., 42 S.W.2d 634, affirmed in Tex.Com.App., 60 S.W.2d 204. The requested issue would have left the jury free to speculate as to the existence of cause or causes other than shown by the evidence.

On the ground that it was "hearsay evidence," appellant objected to the following testimony by the witness Austin;

"Q. Now in relation to that work he was doing; what type of work was Crosby doing? A. He was helping weld part of the time but when he was working with me he was test caulking, putting the test on tanks.

"Q. Was he working inside tanks or outside? A. We usually gave him the outside.

"Q. Why? What was the reason for that? A. Well he couldn't stand the heat, so he claimed."

"Q. Did he (speaking of Mr. Crosby) just come down one morning and say, 'I am tired of working; I am going to quit.' Or what about that? A. He said he couldn't stand it any longer.

"Q. Was that the first time you heard anything about that? A. No, sir.

"Q. What are the facts about that?"

"Q. Was this in May when he quit over there, the latter part of May, the first time you had heard anything about him leaving the Pennsylvania shipyards? A. No, he told me from the time he first begun working with me he was not going to be able to stay there long, that he couldn't stand it and as soon * * *"
and the following testimony by the witness Hamm;

"Q. Just describe to me and the jury what happened. A. I was working with him and most every day he was still complaining about his eyes."

The testimony complained of by these propositions was not "hearsay," but was admissible as descriptive of existing pain and bodily suffering. Texas Law of Evidence by McCormick & Ray, Secs. 388, 389, and 391; Associated Indemnity Corporation v. Baker, Tex.Civ.App., 76 S.W.2d 153; Security Union Casualty Co. v. Frederick, Tex.Civ.App., 295 S.W. 301; St. Louis & S. W. R. Co. of Texas v. Gill, Tex.Civ.App., 55 S.W. 386; Lumbermen's Reciprocal Association v. Adcock, Tex.Civ.App., 244 S.W. 645; Roth v. Travelers' Protective Association of America, 102 Tex. 241, 115 S.W. 31, 132 Am.St.Rep. 871, 20 Ann.Cas. 97; Houston & T. C. R. Co. v. Shafer, 54 Tex. 641; Parker v. Harrell, Tex.Civ.App., 212 S.W

542, 543; Texas Employers' Ins. Ass'n v. Shoemake, Tex.Civ.App., 21 S.W.2d 583; Texas & P. Ry. Co. v. Barron, 78 Tex. 421, 14 S.W. 698.

Without making a more detailed statement of appellee's petition, we conclude that he sufficiently described the nature and extent of his injury, the nature and extent of the injury to his eyes, his headaches, nervousness, sleeplessness, and continuous pain in the structure of his eyes; and that the description of the nature and extent of his injury was not a mere legal conclusion by the pleader.

The following allegations of the petition were not "mere legal conclusions of the pleader": "The vision of his right eye will be totally lost and that of his left eye will steadily diminish to a point of no practical value to him."

Dr. Taliaferro's testimony, that in his judgment appellee was totally and permanently incapacitated to perform labor, was based upon hypothetical questions, as shown by the statement made above, and did not fall within the rule of "hearsay" restated by this court in Republic Underwriters v. Lewis, 106 S.W.2d 1113, 1114.

The evidence supports the jury's verdict awarding appellee a lump sum settlement.

The judgment of the lower court is in all things affirmed.